## IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

### NO. 2014-CA-00865-COA

| | |
|---|---|
| **MAXWELL LOMAX** | **APPELLANT** |

**v.**

| | |
|---|---|
| **TARA JOHNSON LOMAX** | **APPELLEE** |

DATE OF JUDGMENT: 05/23/2014
TRIAL JUDGE: HON. PERCY L. LYNCHARD JR.
COURT FROM WHICH APPEALED: DESOTO COUNTY CHANCERY COURT
ATTORNEYS FOR APPELLANT: DAVID CLAY VANDERBURG
MAXWELL LOMAX (PRO SE)
ATTORNEY FOR APPELLEE: M.W. ZUMMACH
NATURE OF THE CASE: CIVIL - DOMESTIC RELATIONS
TRIAL COURT DISPOSITION: DIVORCE GRANTED ON GROUND OF
HABITUAL CRUEL AND INHUMAN
TREATMENT
DISPOSITION: AFFIRMED - 08/11/2015
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE IRVING, P.J., BARNES AND FAIR, JJ.

### BARNES, J., FOR THE COURT:

¶1. Maxwell (Max) and Tara Johnson Lomax were married on October 25, 2013. The couple, who had a troubled relationship prior to the marriage, separated less than three months later, on January 11, 2014. There were no children born of the marriage, and the couple acquired no real property during the marriage.

¶2. Tara filed a complaint for divorce on February 7, 2014, alleging habitual cruel and inhuman treatment or, in the alternative, irreconcilable differences. Max contested the divorce. Tara amended her complaint on April 16, 2014, claiming Max was addicted to illicit

drugs.

¶3.    After a hearing on the matter on May 23, 2013, the DeSoto County Chancery Court granted the divorce on the ground of habitual cruel and inhuman treatment.  Although the chancellor concluded that the couple had no marital property, he determined that the couple had incurred $5,000 in debt, which included $2,000 expended for Max's business leads and $3,000 for wedding expenses.  He ordered Max to pay Tara $3,500 toward that debt within forty-five days of the order.  Tara was awarded the engagement ring given to her by Max, along with the couple's two vehicles, as she held sole title to both of them.

¶4.    Max filed a post-trial motion, arguing there was insufficient proof to support a divorce of the ground of habitual cruel and inhuman treatment, and that the award of the engagement ring to Tara was in error. The chancellor denied the motion.  On June 20, 2014, Max appealed.[1]  Finding no error, we affirm.

## STANDARD OF REVIEW

¶5.    In domestic-relation cases, our review is limited to whether the chancery court's findings were "manifestly wrong or clearly erroneous, or the court applied the wrong legal standard." *Jackson v. Jackson*, 114 So. 3d 768, 773 (¶10) (Miss. Ct. App. 2013).  If there is substantial evidence in the record to support the chancery court's findings of fact, we will not reverse its decision on appeal. *Henrichs v. Henrichs*, 32 So. 3d 1202, 1205 (¶8) (Miss. Ct.

---

[1] The record indicates that Max's trial attorney withdrew as counsel on December 31, 2014, and Max is proceeding pro se.

App. 2009).

## I. Whether the chancery court erred in granting the divorce on the ground of habitual cruel and inhuman treatment.

¶6. Max claims that the chancery court should not have granted Tara a divorce on the ground of habitual cruel and inhuman treatment, which encompasses conduct that either:

> (1) endangers life, limb, or health, or creates a reasonable apprehension of such danger, rendering the relationship unsafe for the party seeking relief, or (2) is so unnatural and infamous as to make the marriage revolting to the nonoffending spouse and render it impossible for that spouse to discharge the duties of marriage, thus destroying the basis for its continuance.

*Harmon v. Harmon*, 141 So. 3d 37, 41 (¶14) (Miss. Ct. App. 2014) (quoting *Smith v. Smith,* 90 So. 3d 1259, 1262 (¶10) (Miss. Ct. App. 2011)). Such conduct must constitute more than mere unkindness, lack of affection, or incompatibility. *Id*. (citing *Jackson v. Jackson*, 922 So. 3d 53, 56 (¶4) (Miss. Ct. App. 2006)). Furthermore, "[t]he cruel treatment must be routine and continuous." *Jackson*, 922 So. 2d at 56 (¶4) (citing *Moore v. Moore,* 757 So. 2d 1043, 1047 (¶16) (Miss. Ct. App. 2000)).

¶7. At the hearing, neither party disputed they had a tumultuous relationship prior to their marriage that had resulted in physical altercations, with one incident involving police intervention. However, Max claimed there was no ground for divorce, as he had never physically assaulted Tara *during* their marriage, and he wanted to seek marriage counseling rather than divorce. Tara, on the other hand, stated that Max had physically abused her on a consistent basis after the marriage. She submitted photographic evidence of injuries (multiple bruises, a busted lip, and a cut forehead) to her face and body. Tara claimed that

3

the injuries depicted in the photos were inflicted during the marriage, and she could not continue to stay married to Max.

> Q.      You heard [Max] say that he, quote, absolutely did not strike you after y'all got married.  Was that true?
>
> A.      No.
>
> Q.      The photographs that you have, are those the only times that you were injured and you took photos, or were there other times that you didn't take photos.
>
> A.      There were other times.
>
> Q.      Do you feel safe in that house?
>
> A.      No.

¶8.      Evidence of emotional abuse was also presented through text messages sent from Max to Tara, concerning her weight fluctuation, among other matters.  During direct examination, Tara testified that the texts were "just a sampling.  I mean, I've suffered so much emotional abuse from him[,] along with physical abuse.  It's just unreal. . . . throwing things at me when he loses his temper, hitting me.  I mean . . .he's a loose cannon.  He's violent.  He cusses me out.  He, you know, insults me."  Tara further testified that two marriage counselors, from whom the couple had sought assistance, had advised them to divorce.

¶9.      Max claims that the chancery court erroneously "den[ied]" relevant evidence regarding fights between Max and Tara that occurred prior to the marriage.  He refers to his testimony regarding two separate altercations, and DeSoto County Deputy Sheriff James Gray's testimony that he investigated one of the domestic incidents between Tara and Max.

He claims this testimony disproves Tara's statement that her injuries occurred during the marriage. We find no merit to Max's argument; the record clearly indicates that both Max and Gray were allowed to testify regarding the pre-marriage altercations between the parties. The chancery court merely concluded that Deputy Gray's testimony was not relevant because the parties did not dispute that the pre-marriage argument took place. Furthermore, Deputy Gray was unable to confirm that the photographic evidence reflected any of the injuries he saw on Tara that evening.

¶10. Consequently, we find there was ample evidence to support the chancellor's judgment, granting a divorce on the ground of habitual cruel and inhuman treatment.

II. **Whether the chancery court erred in its equitable distribution of marital property.**

¶11. The main point of contention in the divorce and the determination of marital property concerned the chancery court's award of the engagement ring to Tara. The chancellor concluded that Tara was entitled to keep the ring, which had previously belonged to Max's mother, since Max had given the ring to Tara as an inter vivos gift prior to the marriage. Max argues that the parties had an oral agreement that if the marriage did not work out, the ring would be returned to his mother. At the hearing, Max testified that his mother's ring was given to Tara under the condition that once Max could afford another stone for the ring setting they had purchased, she would return the ring.

¶12. Tara, however, emphatically denied that there was an actual agreement that the ring would be returned, but she acknowledged that after the couple separated, she told her mother-

in-law she wanted to be "fair" and return the stone.  But she explained at the hearing that when she made that comment to Max's mother, she "didn't realize that [Max] intentionally wanted to cost [her] $20,000" to obtain the divorce.

¶13.    In *Neville v. Neville*, 734 So. 2d 352, 357 (¶19) (Miss. Ct. App. 1999), this Court held that since an engagement ring was a gift that predated the marriage of the parties, it "was not a marital asset subject to equitable division."  "It was, therefore, beyond the chancellor's authority to order [the wife] to return possession of that item to [the husband] and [the chancellor's] refusal to do so cannot constitute reversible error on appeal." *Id*.  Accordingly, we find no error in the chancellor's decision to award the engagement ring to Tara.

¶14.    Additionally, Max summarily states that he received no interest in the Range Rover that was purchased during the marriage, although he makes no actual claim on appeal that the Range Rover was marital property.  However, Tara was solely responsible for the loan payments on the Range Rover, and she sold her former vehicle to pay equity towards the Range Rover's purchase.  Therefore, we find no error in the chancery court's determination that this personal property was Tara's non-marital property.

###    III.    Whether Tara was entitled to attorney's fees at trial and on appeal.

¶15.    In both her original and amended complaint for divorce, Tara requested that she receive attorney's fees "for both temporary and permanent matters."  In his response to the amended complaint, Max asked the chancery court to "assess *all* court cost[s] and attorney'[s] fees against the plaintiff, Tara Lomax." (Emphasis added).  At the hearing, the

6

chancellor stated:

> With respect to the request for attorney['s] fees by both parties, the Court . . . finds that an inability to pay must be shown before attorney['s] fees may be awarded in a divorce case. Both parties here have adequate estates and income which would allow them to pay their attorney['s] fees, and accordingly, no inability to pay has been shown by either party, and both will be responsible for the payment of their own attorney['s] fees.

Thus, in the May 28, 2014 order granting the divorce, the chancery court stated that "[both] part[ies have] an adequate estate to pay their own attorney['s] fees, and [both] part[ies are] responsible for their own attorney['s] fees."

¶16. Tara contends in her appellee's brief that the chancery court erred in not ordering Max to pay her attorney's fees, arguing that "[t]he appeal [by Max] is clearly for the purposes of increasing [her] attorney['s] fees and is nothing more than rank harassment." She requests that this Court invoke Rule 38 of the Mississippi Rules of Appellate Procedure and award her attorney's fees and costs of the appeal. Max did not address the issue of attorney's fees in either his original or reply brief, except to assert that he has not filed "any frivolous or baseless claims[.]"

¶17. This Court has held that "[i]n order for the appellee to gain reversal of any part of the decision of a trial court about which the appellant brings no complaint, the appellee is required to file a cross-appeal." *Delta Chem. & Petroleum Inc. v. Citizens Bank of Byhalia, Miss.,* 790 So. 2d 862, 878 (¶52) (Miss. Ct. App. 2001). As Tara seeks to reverse and alter the chancery court's portion of the judgment that states both parties are responsible for their own attorney's fees, Tara was required to file a cross-appeal on this issue. As she failed to

7

do so, the issue regarding the award of attorney's fees at trial will not be addressed on appeal.[2]

¶18.　Furthermore, in order for this Court to award Tara costs and attorney's fees *on appeal* pursuant to Rule 38, we would have to determine that Max's appeal and claims are frivolous. Max brought several claims on appeal – specifically that the chancellor erred in (1) granting the divorce based on habitual cruel and inhuman treatment; (2) denying testimony regarding altercations prior to the marriage; (3) the division of the marital property; and (4) not ruling that the engagement ring should be returned to Max.　Whether a claim is frivolous "under Rule 38 is evaluated using the same standard that applies under Rule 11 of the Mississippi Rules of Civil Procedure." *Balius v. Gaines*, 95 So. 3d 730, 732 (¶10) (Miss. Ct. App. 2012) (citing *Harris v. Harris,* 988 So. 2d 376, 380 (¶16) (Miss. 2008)).　"Accordingly, an appeal is frivolous under Rule 38 where the appellant has no hope of success." *Id.*

¶19.　While we do not find Max's claims to be meritorious, we do not find them to be

---

[2] Regardless, "[t]he award of attorney's fees in divorce cases is left to the discretion of the chancellor, assuming he follows the appropriate standards." *Speights v. Speights*, 126 So. 3d 76, 81 (¶15) (Miss. Ct. App. 2013) (quoting *Creekmore v. Creekmore,* 651 So. 2d 513, 520 (Miss. 1995)).　"We are reluctant to disturb a chancellor's discretionary determination whether or not to award attorney's fees and . . . the amount of any award." *Rhodes v. Rhodes*, 52 So. 3d 430, 449 (¶77) (Miss. Ct. App. 2011) (quoting *Smith v. Smith,* 614 So. 2d 394, 398 (Miss. 1993)).　As noted by the chancellor in the present case, "[a]ttorney['s] fees are not generally awarded unless the party requesting such fees has established the inability to pay." *Creekmore,* 651 So. 2d at 520.　Tara said that she borrowed money from her parents to pay a portion of her attorney's fees ($3,600), but she also acknowledged that she earned $58,000 a year.　There is nothing to suggest that the chancellor erred in his determination that both parties had the ability to pay their respective attorney's fees at trial.

frivolous. Max clearly desired to make Tara "pay" for divorcing him. A copy of a text message sent from Max to Tara on January 22, 2014, was submitted into evidence. In the message, he stated:

> I told you [to] get ready for the fight of your life, what I mean by that is that you and your lawyer that you are about to hire is gonna cost your parents['] ass . . . ! Oh[,] and every time it's continued[,] it's another [$]1000.00, and it's another 1000.00 every time your lawyer tells you don't worry about him and his threats. . . !
>
> . . . .
>
> So, your cheating friends that know the Lord that wanna advise you and give you guidance, tell them to get the[ir] check books out!! This could easily cost you 15 to 20 thousand! Truth ask your lawyer, I've asked mine already.

Max admitted at the hearing that he told Tara he would see to it that she spent tens of thousands of dollars in attorney's fees. As deplorable as Max's conduct was, "the award of attorney's fees is based on necessity rather than entitlement." *Faerber v. Faerber*, 150 So. 3d 1000, 1009 (¶33) (Miss. Ct. App. 2014) (quoting *Carroll v. Carroll,* 98 So. 3d 476, 483 (¶26) (Miss. Ct. App. 2012)). The chancery court did not award Tara attorney's fees at trial, and we cannot find that Max's claims are frivolous. Therefore, we find nothing to support Tara's claim that she is entitled to costs and attorney's fees on appeal.

¶20. **THE JUDGMENT OF THE CHANCERY COURT OF DESOTO COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.**

**IRVING AND GRIFFIS, P.JJ., ISHEE, CARLTON, MAXWELL, FAIR AND WILSON, JJ., CONCUR. JAMES, J., CONCURS IN PART WITHOUT SEPARATE WRITTEN OPINION. LEE, C.J., NOT PARTICIPATING.**